Okay, the next case is number 13-14-16, SSGA limited against the United States, Mr. Morris. May it please the court, my name is Daniel Morris, counsel for SRCLMDA limited. With me today is Mark Plon. As the court knows, this is a trade case involving whether commerce properly corroborated an AFA rate as required by 19 U.S.C. section 1677E. And what commerce did here was to choose rates from prior administrative reviews or from other respondents according to its predefined selection hierarchy. And because commerce chose those rates according to the hierarchy, commerce determined that they were relevant and reliable. And because commerce determined that they were relevant and reliable, commerce determined that they were probative. Well, commerce had a problem, didn't they? Namely, that your client was uncooperative, as was the government of India, right? The only time that AFA rates are going to be applied and that there's going to be a corroboration requirement is a set of circumstances where there's been a finding that a respondent failed to cooperate to the best of its ability. And that issue was litigated and has been resolved. That's the first step of the AFA process. And that's the only step at which ESSAR's conduct is relevant. The second step is the selection of that secondary information. And the third step is the corroboration from independent sources. That is where commerce's conduct comes into play. Did commerce meet the statutory and regulatory mandate to corroborate from independent sources? Keep in mind, the statute allows for those circumstances where there legitimately are no independent sources. Commerce can make the finding that to the state at its disposal, excuse me, at its disposal, corroboration from independent sources is impossible. That's not what happened here. At most, commerce stated that there are generally no company-specific independent sources available in the CVD context. But that company-specific limitation doesn't appear in the statute, doesn't appear in the regulation. And if it's commerce, commerce could have corroborated these rates. That document is a document placed on the record by Petitioner U.S. Steel that actually triggered the inquiry into the Chhattisgarh subsidies, the subsidies at issue. And it's a document that commerce cited in its memo assigning the AFA rate. The Chhattisgarh industrial policy, again, of record in this proceeding, identifies on its face some of the limitations that demonstrate that this rate can't be corroborated. You have a, I guess, a substantial difficulty, which I'd like you to explain why it's not a difficulty. I understand your basic argument is that the rate here is essentially fictional, and the government's essential submission is it may be fictional, it may not be fictional, but if it's fictional, it's for reasons that you did not adequately present to commerce or place in the record of this proceeding. So what grounds do you have for challenging the rate determined, ultimately determined, that you actually told commerce about in a timely fashion? And where is that in the record? In response to the draft results on rate determination, and those draft results revealed, did not reveal that commerce considered its rates inherently corroborative, but laid through the selection criteria and assigned that 54% rate, we demonstrated to commerce that they had not corroborated these rates and that there were independent sources available to them, specifically the 2006 determination in the AD Administrative Review, that the actual rate was zero, that all 54% of the AFA rate that commerce was seeking to assign was here. Can I get straight about something, and I realize it's possible that this is a usage issue that this court's opinion, and how do you say, decheco, dececo, what's the pronoun? I would just be guessing, so I'm going to call it decheco, is responsible for. We're not really talking about corroboration. There's no question that the rates that they relied on are, in fact, I don't mean the rate they assigned to you, but the various pieces of information that they obtained were accurate pieces of information. That's the normal use of corroboration. That's what 1677 EC is about. Decheco talks, though, about having to justify reasonably the relative accuracy of the rate chosen after drawing an adverse inference under subparagraph B. Why isn't the explanation that commerce gave, and don't use the word corroboration because it's not actually corroboration, a reasonable explanation based on the information within the four corners of the record for its choice of this 50 plus percent rate? I would like to come back to the question of whether or not these rates are demonstrably accurate, but to answer your question first, all commerce has done here is explain their selection criteria, but this court in Decheco also stated that part of the purpose of this third step of the AFA mechanism was to serve as a check on commerce's natural inclination to overreach reality. If commerce's judgment is guiding it towards the selection of the criteria, commerce's judgment can't, therefore, also be that check. The idea is that the statute sets out a means whereby commerce can be checked in its initial impression of the best rates to apply here. As to the accuracy of the rates, it's important to note that the two of the rates that are involved here are borrowed from prior administrative reviews. Right, but those pieces of the prior reviews were actually put in the record in this case in a timely fashion, unlike the material that was at issue in the 2012 case here. This actually is exactly the type of information that was called out in the Statement of Administrative Action that accompanied the Uruguay Round Agreements Act that used prior administrative review rates as an example of the need for corroboration from independent sources because they may not be reliable because they're from different time periods. The Statement of Administrative Act, cited by both sides in this appeal, uses this type of information as an example for the need for corroboration. And there's no requirement that the independent sources commerce gets to use in seeking to corroborate, I'm sorry, the independent sources commerce uses, be of record when commerce goes to corroborate. There's no such restriction. Commerce is given a very wide latitude to try to attempt that reasonably accurate estimate of the respondent's actual rate, albeit with a built-in increase to deter noncompliance. And that makes sense because the entire AFA mechanism is constructed for those times when a respondent didn't, to the best cooperate, to the best of its ability, to provide the information on which commerce would otherwise reply, excuse me, rely. The structure of the statute in identifying secondary information and then seeking to corroborate it from independent sources. But it is nonetheless intended, but that latitude is given so that commerce can continue to work towards the dejectual goal of the reasonably accurate estimate of the respondent's actual rate. Absent that independent corroboration, there's nothing necessarily present to tether commerce's selection of secondary information to the commercial realities. And absent that tethering of the secondary information to the commercial reality, the rate becomes wholly punitive and has, and completely runs awry from the statutory scheme as intended. So you had started, I think, by saying that there was a document in the record that, had they read it properly, would have shown that the CIP program had certain limits that would have made the ultimate rate here inappropriate. Am I right in concluding that you did not call attention to the document and say, here's what it says, you can't possibly conclude that we deserve whatever the rate is based on that. That this is an argument about the content of the document that you did not make to commerce. That is correct. The question, though, that was in the context, however, of a remand for the purpose of commerce revealing the basis by which it was corroborating or the rationale that corroboration wasn't possible here. Those draft results just parroted back selection criteria. SR was not put in the position of knowing what it was arguing about. Our comments, as you'll see in the record, were, please, tell us how you're corroborating this information. What are the independent sources you're using? How are these programs similar, thinking that the similar language may be how commerce was attempting to corroborate. It was not until the final results on remand that we learned that commerce deemed its results to be inherently self-corroborative, obviating the need for corroboration from independent sources. And that we weren't arguing about which sources should be used for corroboration and suggesting alternatives. We were arguing about whether corroboration from independent sources was necessary in this context. Commerce still met its burden, I'm sorry, SR still met its burden of demonstrating to commerce that its selection criteria wasn't inherently corroborative by pointing out that we know, we all know what the actual rate is and that it was, that they were 54% off of that rate. But no, there wasn't a specific reference to the Chhattisgarh industrial policy and the specific limitations at issue here, given that commerce's legal position is that its rates were corroborated upon selection. Judicial review was always going to be necessary in this matter. And there's no unfairness to the administrative agency here, given that commerce, this isn't a task that commerce undertook that we could have criticized, they could have adjusted accordingly, and only then dealt with it, as opposed to introducing these challenges for the first time on appeal. This is a task that was not undertaken. Commerce's position is that its rates were corroborated upon selection. If such is the case, then there is no longer any meaningful check to ensure that these rates don't outstrip reality to emphasize commerce's goal of deterrence. We ask the court to adjourn. Thank you, Your Honor. Please, the court. The judgment of the Court of International Trade should be affirmed as it properly determined that the commerce, it properly determined that the remand determination calculated an accurate dumping margin, or countervailing duty margin. Can I just ask at the outset, you don't have any argument, I don't think you made an argument that when this court issued its judgment in 2012, the matter was over, and what the CIT did six months later in asking for more, in remanding for some more information, you don't dispute that the CIT could do that? No. Okay. No, Your Honor. Not at all. SR's argument is essentially that they're trying to read the provision to the extent practicable out of the statute, not of the regulation. As the Commerce Department noted in its remand results, SR was the sole respondent in this segment of the investigation. The Commerce Department had never investigated the Chattisgar Policy Program before. There was no information on the record regarding the Chattisgar Policy Program. They'd never calculated a rate under the program. And so they were very limited on what they could do in determining an AFA rate. Typically, and a lot of the cases SR cites to, are anti-dumping cases. And in anti-dumping cases, you're typically looking for surrogate value information for a good or a, typically a good. The Commerce Department noted that in a countervailing duty case, typically the sole sources of that information are the foreign producer or the foreign government. In this case, SR did not cooperate with the investigation. The government of India did not cooperate with the investigation, and the government of Chattisgar did not cooperate with the investigation. SR has not cited to any evidence, any independent evidence that would be available for the Commerce Department to corroborate this information. And they cite to this, I mean, their citation to the regulation, 19 CFR 35138D, is instructive because it says, independent sources may include but are not limited to published price lists, official import statistics and customs data, and information obtained from interested parties during the investigation or review. There's no evidence of any official price lists on the Chattisgar Industrial Policy Program, what the benefits were to individual producers. There's no company-specific information regarding this program on the record that the Commerce Department could use to corroborate that information. Now, SRs, I- Is there, did you all have, I guess I'm thinking in particular of the document that Mr. Morris referred to. I don't have in mind what was in that document, but that, did that describe the industrial policy in such a way as to communicate any limits on it? There is some information in a document that was placed on the record by U.S. Steel. It's in the record. I don't know if I have the, here it is. It's starting on, I think it's page 70, 78 or 79. And it's a summary document. It appears to be from the Chattisgar government and it has a description of the program, but there's no detailed information. It's a summary document. We don't know if, what producers have applied under the program, what benefits they received. If SR was eligible for the benefits, how benefits would be applied to a specific producer? So in particular, one can't tell from this, for example, this may be an idealized version of their point. If a state gave a 50% subsidy on what turned out to be a 2% input, 2% input, it would be crazy to apply 50% to the bottom line. It would be at maximum a total 1% subsidy for the value of the ultimately of the downstream good. You can't tell anything about that from this? This is a summary document. We don't know if this is accurate for the, I mean it gives a 2004 to 2009. It could have been amended. It could be changed in the future. There is information in here and under certain assumptions, I mean SR could make certain assumptions about how this data would be applied, but there may be other interpretations of this information. And the Commerce Department in its methodology looks for company specific information to see how it was actually applied to other steel producers or how it was applied to other manufacturers. That can't be done just with this piece of information. But I would like to turn, SR also cited to its comments on the draft remand results and said that they had raised an argument regarding the sufficiency of the data. And that's at page 148 of the record. And they say that it makes clear the department had at its disposal other information and they have a footnote 4. And then it says, footnote 4 it says the, it cites to admin record confidential document 1229 exhibit 4. That's the exact document that was at the subject of the prior appeal in this case. That is the very document that this court remanded to the Court of International Trade and said you can't force the Commerce Department to look at this document. And so the argument that SR did make to the Commerce Department was that you should look at this document from the prior administrative review that, oh yeah, well the circuit already said you can't force the Commerce Department to look at it, but they should have looked at this document that found that we didn't participate in this and used that as corroboration for the AFA rate that was applied. Are you saving some time for Mr. Bowen? Yes. Thank you, Your Honor. Good morning, Your Honor. May it please the Court, my name is Nathaniel Bowen of Skadden Arpslate, Mar and Flom, appearing on behalf of the United States Steel Corporation. Rather than try to repeat anything that the counsel for the government has just said, I'd like to begin with the question of the content of the Chattisgarh industrial policy, what has been on the record, what inferences, if any, it might be possible to draw from that document. I think it's very clear that that document is an overall policy document where it is not clear at all how these programs are administered in practice, and indeed that's why the Department of Commerce was, from the very beginning of this case, seeking information about the functioning of those policies, not only from SR, but also from the state government of Chattisgarh and the government of India. Each of those interested parties, the only interested parties who could have possibly benefited from that policy or administered it all refused to cooperate, as this Court has already found in SR 3. As a result, we don't have any information about how that program functioned in practice. It was appropriate for the Department of Commerce to apply adverse facts available on that basis, again, as this Court has held. What SR is seeking to do in this appeal is to have Commerce, after denying Commerce the benefit of any response from any of the parties who had access to relevant information, it's seeking to have the Department of Commerce draw an inference that is not adverse to SR, but is in fact favorable to SR. There's no basis for that under the statute or under the facts of this case. Setting that aside, however, I think if I've heard counsel for SR this morning correctly, SR has admitted that it waived the arguments concerning the content of the Chattisgarh industrial policy, how it should be interpreted, because it failed to raise those in its comments on the draft review. So it does seem to me that, at least on that, which is pretty central, it comes down to something that I have not studied with as much care as you have. That is, what does that document circumscribe about the outer boundaries of the possible subsidies that Commerce could have and perhaps should have understood from the document itself without any argument being made about it. That document sets forth nine separate subsidies that, on its face, appear to have been granted by the state government of Chattisgarh during this period. It was a viable policy during that period. The document doesn't give any indication of actual use of these policies, how they were applied in practice. To go to your Honor's question about is it reasonable to say that if there's an input that's received under this subsidy that that would somehow be equal to 50% of the, provide a 50% ad valorem subsidy rate to SR, we don't know. What we do have here is other information on the experience of SR and other Indian hot-melt-steel producers of subsidization in India by state governments and by the government of India. We have the actual information that SR and other Indian hot-melt-steel producers provided to Commerce, that Commerce verified, and that Commerce used to calculate the ad valorem subsidy rate for these various subsidies. These subsidies were equivalent to, similar to, the types of subsidies that are at issue here. On the point about the provision of iron ore or provision of these, what SR claims to be upstream inputs, it's very clear that SR receives benefits from those types of subsidies at an equivalent rate. It received a 16.14% ad valorem rate for the provision of high-grade iron ore, very similar to the beneficiated iron ore that would have been produced at the SR plant in Chhattisgarh at issue. For all these reasons, I... Right, but what, if anything, does the record in front of Commerce tell us about, I guess, the percentage of the bottom-line hot-rolled steel that the iron ore processing, which I think is what was said incorrectly to have taken place in this state, makes up? Well, there are a number of different subsidy programs... I assume it's 100% subsidy on the stuff that took place in this state. What does the record say about what share of the bottom-line product, exported and then imported product, that makes up? I don't think we have that information on the record, Your Honor. We have information on SR's use of separate, related iron ore subsidy programs, but those involve provision of iron ore from separate mines, from separate suppliers. We don't know exactly how this would have gone through to SR's own bottom-line, but we do have information on the types of similar subsidy programs that are at issue here, and we have calculated rates for those. Thank you. Thank you, Mr. Bowling. Mr. Morris. Thank you. I'd like to start by directing the Court's attention to pages 37 and 38 of the appendix. This is the government's issues and decision memorandum, and it includes the government's summaries of the subsidies at issue, as taken from the Chhattisgarh Industrial Policy, and it demonstrates, at least what the government acknowledged to know about these programs at the time it was assigning the AFA rate. Among those limitations acknowledged in the government's memo are hard caps on the total subsidies available for several of these programs at the equivalent of a few thousand dollars apiece, a demonstration that even at this point there was a departure from commercial reality and the AFA rate. There's also been some question about commerce's ability to determine the downstream impact of these rates as applied to an iron beneficiation ore plant, as was found to exist in Chhattisgarh Industrial Policy. It's important to note that the corroboration mechanism, as reflected in the statute, speaks of corroboration from independent sources. Commerce isn't required to find only one document against which they can attempt to determine the commercial reality to determine a commercially reasonably accurate estimate of the respondent's actual rate. I apologize for some of the words. Commerce could have went to multiple sources, including looking at the percentage that goes in, the relative percentages, of the iron beneficiation process as to other respondents in the same way that they borrowed rates from other respondents in this proceeding. The question is not whether there were other independent sources from which commerce could have corroborated. I'm not sure that there's any place in the record that commerce squarely said that corroboration was impractical on that basis. I believe generally they stated that corroboration is generally unavailable in the CBD context, but I don't know that they made a specific finding here, and that seems like the type of determination that should be made clear and unequivocally. The question isn't that there wasn't those rates. It's just that commerce believed them not to be necessary because they believed their selection criteria to be inherently corroborative. It's syllogistic compliance with the statute, not actual compliance. If this court upholds commerce here, there is effectively no longer a corroboration requirement for AFA rates in the CBD context. Because there's no corroboration on the record, nor any explanation of why corroboration from independent sources wasn't available here, we ask the court to reverse. Thank you. Thank you, Mr. Morris. Thank you all. The case is taken under submission.